UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LARRY McMILLIAN,

                Petitioner,                              Hon. Paul L. Maloney

v.                                           Case No. 1:06-CV-57

MARY BERGHUIS,

                Respondent.

_____/


**REPORT AND RECOMMENDATION**

        This matter is before the Court on McMillian's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that McMillian's petition be **denied**.


**BACKGROUND**

        As a result of events which occurred on May 9, 2002, Petitioner was charged with armed robbery, possession of a firearm during the commission of a felony, felonious assault, and possession of a firearm during the commission of a felonious assault.  (Trial Transcript, Sept. 17, 2002, 6-7).  Several individuals testified at Petitioner's jury trial.  The relevant portions of their testimony are summarized below.

1

**David Little**

As of May 9, 2002, Little owned Stimac's Grocery which was located on 883 East Michigan Avenue in Emmett Township, Calhoun County. (Trial Transcript, Sept. 17, 2002, 154-56). Stimac's Grocery was robbed on May 9, 2002. (Tr. 156). Little was not at the grocery at the time of the robbery, but arrived shortly thereafter. (Tr. 156). After arriving at the grocery, Little provided the police with a videotape of the robbery as recorded by the grocery's surveillance equipment. (Tr. 156-57). Little testified that "a little over" $300 was taken during the robbery. (Tr. 158).

**Shane Schwarz**

As of May 9, 2002, Schwarz was employed as a Patrol Officer for the Emmett Township Department of Public Safety. (Trial Transcript, Sept. 17, 2002, 160-61). At approximately 7:00 p.m. that evening, Officer Schwarz was dispatched in response to the robbery of Stimac's Grocery. (Tr. 161-62). The dispatcher informed Schwarz that the "suspect vehicle" traveled down Cornwell Street after departing the grocery. (Tr. 163). Schwarz traveled down Cornwell Street where he observed "two juveniles that were standing there." (Tr. 163). Schwarz asked the juveniles "if they had seen a car racing through the area." (Tr. 163). The juveniles responded, "yeah, they just saw a black Corsica southbound on Cornwell." (Tr. 163). They indicated that there were two black males in the vehicle and that the vehicle had turned right (west) onto to Cliff Street. (Tr. 163-64). Officer Schwarz traveled down Cliff Street, but was unable to locate the suspect vehicle at which point he proceeded to Stimac's Grocery. (Tr. 163-64).

Shortly after arriving at the grocery, Officer Schwarz was informed that Battle Creek Police had "stopped a possible suspect vehicle at Michigan and Elm." (Tr. 164). In response to this

information, Officer Barbre, who was also at Stimac's Grocery investigating the robbery, proceeded to the location where the suspect vehicle was located. (Tr. 164). Officer Schwarz remained at Stimac's and interviewed the victims. (Tr. 164-65). Schwarz also received into evidence the videotape recorded by the grocery's surveillance system. (Tr. 165). Approximately ten minutes after arriving at Stimac's, Officer Schwarz was instructed to transport two of the victims, Joseph Johnson and Danielle Kane, to the location where the suspect vehicle had been stopped, which was located approximately two miles away from Stimac's Grocery. (Tr. 165-68).

When Officer Schwarz arrived at this location he observed that the suspect vehicle was unoccupied and that two men had been placed in the back seat of a police vehicle. (Tr. 169). Officer Follett, with the Battle Creek Police Department, then approached Schwarz and informed him that "they were going to have the suspects get out of the car" and then told Johnson and Kane that "if they identified anybody, let him know." (Tr. 169). Schwarz, Johnson, and Kane remained in Schwarz's patrol vehicle. (Tr. 170). Johnson was unable to positively identify the man who robbed the grocery, but Kane positively identified one of the men as the robber. (Tr. 170-86).

**Victor Pierce**

As of May 9, 2002, Pierce was employed as a Sergeant with the Battle Creek Police Department. (Trial Transcript, Sept. 17, 2002, 191). At approximately 7:00 p.m. on that evening, Sergeant Pierce learned that Officers Follett and Cipcic had stopped a vehicle near the intersection of Elm and Michigan in connection with an armed robbery. (Tr. 190-93). Sergeant Pierce immediately went to this location to assist the officers. (Tr. 193-95). Upon arriving the scene, Pierce observed that the man sitting in the passenger side of the suspect vehicle was wearing a blue

baseball hat.  (Tr. 197).

        The two occupants of the suspect vehicle were subsequently placed in the back seat of Officer's Follett's police vehicle.  (Tr. 195-96).  Sergeant Pierce then approached the suspect vehicle to make sure that there were not any additional individuals hiding therein.  (Tr. 199).  When Pierce looked inside the vehicle he immediately "observed in plain view a small semiautomatic weapon setting underneath the passenger seat."  (Tr. 199-200).  A subsequent search of the suspect vehicle's glove box revealed "a large amount of cash."  (Tr. 202).

**Joseph Johnson**

        On the evening of May 9, 2002, Johnson was working at Stimac's Grocery.  (Trial Transcript, Sept. 18, 2002, 224-27).  At approximately 6:40 p.m., he and Danielle Kane were standing "behind the counter" when a man entered the store and requested a "half pint of Hennessy."  (Tr. 225-27).  The man paid for the item and when Johnson attempted to hand the man his change, Johnson noticed that the man was holding a gun.  (Tr. 227-31).  Johnson identified the weapon as a semiautomatic handgun.  (Tr. 230-31).  The man then stated, "leave the drawer open, give me the money and lay down on the floor."  (Tr. 227-29).  Johnson "got down on the ground" as instructed and then "hit the alarm."  (Tr. 232-33).  As soon as he "heard the door open," Johnson arose from the floor and ran outside the grocery "to see which way he went."  (Tr. 233).  When Johnson went outside, a man informed him that he saw the robber "get into a black car."  (Tr. 233-34).  Johnson observed the black car driving south on Cornwell Street.  (Tr. 235-37).

        Johnson did not observe the robber's face.  (Tr. 241).  Johnson testified that when the man entered the grocery he was "validating tickets at the lottery" and, therefore, "didn't look at the

customer." (Tr. 231, 241-42). When the man asked for a bottle of Hennessey, Johnson "turned around" to get the bottle. (Tr. 231). Johnson testified that when he completed the transaction and saw the weapon, he did not look at the man's face, but was instead focused on the weapon which the man was holding at counter level. (Tr. 228-29). Johnson also testified that the man was wearing a hat which was "kind of pulled down over his face a little bit." (Tr. 228).

Police officers arrived at the grocery "a few minutes" after the robbery. (Tr. 237). After providing a statement to the police, he and Danielle Kane were taken by a police officer to a location near the intersection of Elm and Michigan. (Tr. 238-39). The police officer told Johnson that a car "matching the description" had been stopped and the police wanted Johnson and Kane to "look at some people" to determine if any of them were involved in the robbery. (Tr. 238-39). Johnson first observed that the car which the police officers had stopped "definitely looked like the same car" that he had seen driving away from the grocery immediately following the robbery. (Tr. 239-40). A police officer then "brought [the two men] out one at a time for us to look at." (Tr. 240). However, because he "never got a look at the robber's face," Johnson was unable to identify either man as the robber. (Tr. 241).

At trial, when Johnson was shown the weapon that was retrieved from underneath the passenger seat of the vehicle Petitioner was riding immediately after the robbery, Johnson stated, "that's the gun that was pointed at me." (Tr. 243, 356-57). When asked, "how do you recognize that as being the same gun?," Johnson responded, "[t]he silver - I seen the whole silver part when it was pointed at me. I was staring right at it." (Tr. 243-44). When Johnson was shown the jacket that was recovered from the vehicle in which Petitioner had been riding, he stated, "[i]t definitely looks like the jacket that the robber wore when he came in the store." (Tr. 244-45, 358).

5

**Danielle Kane**

On the evening of May 9, 2002, Kane was working at Stimac's Grocery.  (Trial Transcript, Sept. 18, 2002, 257-58).  At approximately 6:40 p.m., Kane observed a man enter the grocery. (Tr. 258-59). Kane looked the man in the face and said, "hi, how are you today?" (Tr. 259-60). The man responded, "good," and then walked to where Joseph Johnson was working. (Tr. 259). Kane was standing "an arm's length" from the man when she spoke with him. (Tr. 260). Kane observed that the man was wearing a ball cap and a black jacket with green writing on the back. (Tr. 262, 266).

The man asked Johnson for "a half pint of Hennessy." (Tr. 258-59). Kane observed Johnson get the item and take the man's money, at which point she returned to what she was doing. (Tr. 259, 266). A moment later, Kane heard Johnson yell at her to "get on the floor." (Tr. 259, 265-66). Kane, who was standing behind Johnson, turned around and saw the man holding a gun. (Tr. 259, 264-65). Kane then dropped to the floor. (Tr. 265-66).

A short time later, Kane and Johnson were "taken to a scene where a car was pulled over." (Tr. 267). An officer informed Kane to inform him "if you think that's the guy that did it and, if not, okay." (Tr. 267). Kane was unable to identify the first man because she had "never seen him before." (Tr. 269). When she observed Petitioner, Kane "was sure that was him." (Tr. 272). Kane testified, however, that because "sometimes a hat will hide your hair, things like that" she wanted to "reassure" herself that Petitioner was the man who had just robbed the grocery. (Tr. 272). So, Kane asked an officer "could you please have him put the ball cap back on"? (Tr. 270-72). Kane testified that she asked this because she "wanted to make sure that that was him." (Tr. 272). When the cap was placed on Petitioner's head, Kane immediately stated, "yes, that is him." (Tr. 270-71).

At trial, Kane was shown the jacket that was recovered from the vehicle in which Petitioner had been riding immediately after the robbery.  (Tr. 273, 358).  When she saw the jacket, Kane stated, "I know that that is the coat."  (Tr. 273).  She testified that she was sure "because of the green writing on the back."  (Tr. 273-74).  When Kane was shown the weapon which was retrieved from the vehicle in which Petitioner was riding immediately following the robbery, Kane responded, "I believe that is the gun."  (Tr. 275, 356-57).

**Kenneth Moorehead**

At approximately 6:35 p.m. on May 9, 2002, Moorehead arrived at Stimac's Grocery. (Trial Transcript, Sept. 18, 2002, 303).  Before exiting his vehicle, Moorehead observed a man exit the grocery "with a bag in his hand."  (Tr. 304-05).  The man, who was wearing a hat, "was looking in the bag" and "then, all of a sudden, [he] started running."  (Tr. 304-05, 311).  Immediately thereafter, a clerk exited the grocery and asked Moorehead, "where'd that gentleman go?"  (Tr. 305-06).  The clerk told Moorehead that the grocery had "just been robbed."  (Tr. 306).  Moorehead told the clerk that the man ran down the street.  (Tr. 306).  At that point, another man approached Moorehead and the clerk and informed them that the robber "went and got in that black car there." (Tr. 306-10).

The car, a black General Motors vehicle, then drove around the corner.  (Tr. 310-11). Moorehead saw two black men inside the vehicle, one of whom, the passenger, was wearing a hat. (Tr. 310-11).  At that point, Moorehead "took off and followed" the vehicle.  (Tr. 311-12). Moorehead followed the car until it was stopped by the police near the intersection of Michigan and Elm.  (Tr. 312-14).  Moorehead testified that from the time he initially spotted the vehicle outside

the grocery until it was stopped by the police, the vehicle in which the robber departed the grocery was never out of his sight. (Tr. 315). Moorehead further testified that during this time, nobody else entered the vehicle. (Tr. 315). Moorehead was unable to get a "good look" at the robber when he exited the grocery. (Tr. 320). However, when he was shown the jacket recovered from the vehicle in which Petitioner was captured, Moorehead stated that, "I can't say if that's the jacket, but those are the colors." (Tr. 320).

**Shawn Follett**

As of May 9, 2002, Follett was employed as an Officer with the Battle Creek Police Department. (Trial Transcript, Sept. 18, 2002, 330). While on duty that day, Officer Follett and Officer Cipcic were patrolling together when they were instructed to be on the lookout for a "black Corsica" that was involved in an armed robbery. (Tr. 330-31). Officer Follett spotted the suspect vehicle at the intersection of Elm and Michigan. (Tr. 331). After maneuvering his police car behind the suspect vehicle, Officer Follett initiated a traffic stop. (Tr. 331-33). Officer Follett identified Petitioner as the passenger in the suspect vehicle. (Tr. 333-39). Follett further testified that Petitioner had been wearing a blue baseball hat at the time of the traffic stop. (Tr. 335-36). After Petitioner and the driver exited the vehicle, Officer Follett approached the vehicle, at which time he observed a gun laying underneath the passenger seat. (Tr. 336-37).

**Frank Rugg**

As of May 9, 2002, Rugg was employed as an Emmett Township Public Safety Officer. (Trial Transcript, Sept. 18, 2002, 351). While on duty that afternoon, Officer Rugg was

8

instructed to be on the lookout for a "black Corsica" that was involved in a robbery. (Tr. 351-52). Shortly after receiving this information, Rugg was informed that Battle Creek police officers had "had stopped a vehicle in the area of Elm and Michigan." (Tr. 352). Officer Rugg immediately proceeded to that location and subsequently participated in the search of the suspect vehicle. (Tr. 352-54). As part of this search, Rugg recovered a black jacket with green lettering, a stainless steel handgun, and a "wad of money" from the glove box. (Tr. 354-57).

**Lance Barbre**

As of May 9, 2002, Barbre was employed as an Emmett Township Public Safety Officer. (Trial Transcript, Sept. 18, 2002, 369). While on duty that afternoon, Officer Barbre was dispatched to Stimac's Grocery to investigate an "incident." (Tr. 369-70). Upon arriving at the grocery, Officer Barbre spoke with Joe Johnson and Danielle Kane. (Tr. 370-71). Barbre was then informed that suspects in the robbery had been detained nearby. (Tr. 370-73). Officer Barbre immediately went to this location and assisted the other officers search the suspects' vehicle. (Tr. 372-73). During this search, Officer Barbre recovered a bottle of Hennessy from the back seat. (Tr. 373-77). The search also revealed a silver handgun with black handles, a jacket with green lettering, and "a little over $300 in cash from the glove box." (Tr. 374-77).

**Robert Cipcic**

As of May 9, 2002, Cipcic was employed as a Battle Creek Police Officer. (Trial Transcript, Sept. 18, 2002, 392-93). At approximately 7:00 p.m. on May 9, 2002, Officer Cipcic was on patrol with Officer Follett when they were informed that an armed robbery at just occurred at

9

Stimac's Grocery. (Tr. 393-94). The officers were instructed to be on the lookout for a "four-door Chevy Corsica occupied by two black males." (Tr. 393). Cipcic and Follett soon thereafter observed a car matching this description at the intersection of Elm and Michigan. (Tr. 393-94). Officer Cipcic noticed that the man in the passenger seat was wearing a baseball cap. (Tr. 395). The officers immediately stopped the vehicle and requested that the occupants exit the vehicle. (Tr. 395-96). Cipcic identified Petitioner as the man who had been riding in the passenger seat of the vehicle. (Tr. 396-97). After Petitioner and the driver of the vehicle had been taken into custody, Officer Cipcic approached the vehicle. (Tr. 397-98). When he looked inside the vehicle, Officer Cipcic observed a silver and black handgun underneath the passenger seat. (Tr. 398-99).

**Sheila McMillian**

Petitioner's wife testified that on May 9, 2002, Petitioner departed their residence at approximately 5:00 p.m. with a man named Hasan. (Trial Transcript, Sept. 19, 2002, 408-10). McMillian testified that when Hasan arrived at her house that day he was driving a black Corsica. (Tr. 412). She testified that Hasan was wearing the jacket that was later recovered from the vehicle in which Petitioner was riding immediately following the robbery of Stimac's Grocery. (Trial Transcript, Sept. 18, 2002, 358; Trial Transcript, Sept. 19, 2002, 411). McMillian testified that Hasan was also wearing a hat that day. (Trial Transcript, Sept. 19, 2002, 411-12).

Following a jury trial, Petitioner was convicted of armed robbery, possession of a firearm during the commission of a felony, felonious assault, and possession of a firearm during the commission of a felonious assault. (Trial Transcript, Sept. 19, 2002, 510-13, 525). As an habitual offender, Petitioner received concurrent sentences of 216-480 months for armed robbery and 24-72

months for felonious assault. (Sentence Transcript, Oct. 21, 2002, 25-26). Petitioner also received

consecutive sentences of 24 months in prison for each of the firearm convictions. (Tr. 25-26).

Petitioner, who was represented by counsel, appealed his conviction to the Michigan Court of

Appeals asserting the following claims:

> I.  Defendant was deprived of his XIV rights of equal protection and his Am VI right to a fair trial when the prosecutor preemptorily challenged an African American based on race.

> II.  Defendant was deprived of his Ams V and XIV rights of due process when the trial court denied his motion to suppress out of court identification.

> III.  Defendant was deprived of his Ams V and XIV rights of due process when a witness was permitted to repeatedly explicate evidence of the crime scene.

> IV.  Defendant was deprived of his Ams V and XIV rights of due process when a police officer testified, in effect, that alleged co-perpetrator Hasan Warlick was in custody.

> V.  Defendant was denied his Ams V and XIV rights of due process of law and his right of confrontation by the trial court's erroneous decision to allow hearsay testimony which was inadmissible either as a statement by a co-conspirator or as a statement against interest.

> VI.  Defendant was deprived of his Ams V and XIV rights of due process and his Am VI right of effective counsel because defense trial counsel was constitutionally ineffective in committing a major error when he asked a witness to whom the gun in question belonged and when he failed to follow through on the grant of a lineup.

11

Petitioner also submitted a supplemental brief in which he asserted the following claims:

I.    Should Defendant's convictions be reversed, and the charges dismissed, where he had become the victim of suggestive identification and he was deprived of his Fifth and Fourteenth Amendment rights to due process of law, including his right to counsel, resulting in an obvious miscarriage of justice, when the police induced a witness into identifying Mr. McMillian as the assailant, from a choice of two, by conducting a show-up identification exhibit, in the absence of counsel, and in which the police placed a hat on Defendant's head, and not on the other suspect's head?

II.    Was the procedure utilized by the State to secure Defendant's waiver of his right to a preliminary examination so offensive to the Fifth and Fourteenth Amendment requirements of due process that it amounted to a jurisdictional defect requiring reversal of his conviction?

III.    Should Defendant's conviction of all charges be reversed where, absent the tainted identification, there was insufficient evidence to sustain a finding of guilt, beyond a reasonable doubt, on every element of the crimes charged?

IV.    Did the prosecutor's office engage in prosecutorial misconduct, denying Defendant his Fifth Amendment right to a fair trial, when it (1) induced Defendant into waiving his preliminary examination in exchange for a corporeal line-up which it never intended to provide; (2) provided false and/or misleading information to the court in an effort to deny Defendant the line-up that was promised to him; and (3) belittled defense counsel, and counsel's trial tactics and defenses, in the eyes of the jury?

V.    Was Defendant deprived of his Sixth Amendment right to effective assistance of counsel when trial

counsel failed to sufficiently investigate, prepare, and present his only defense; where counsel failed to locate, consult with, or prepare available witnesses; where counsel failed to properly prepare and present critical motions; where counsel failed to obtain and/or utilize critical impeachment material; where counsel refused to allow Defendant to testify in his own behalf; and where counsel failed to object to damaging prosecutorial comments.  In short, did counsel fail to insure that his client's right to a fair trial was adequately protected.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. McMillian*, No. 244711, Opinion (Mich. Ct. App., May 6, 2004).  Asserting the following claims, Petitioner moved in the Michigan Supreme Court for leave to appeal:

I.   Defendant was deprived of his XIV rights of equal protection and his Am VI right to a fair trial when the prosecutor preemptorily challenged an African-American based on race.

II.  Defendant was deprived of his Ams V and XIV rights of due process when the trial court denied his motion to suppress out of court identification.

III. Defendant was deprived of his Ams V and XIV rights of due process when a witness was permitted to repeatedly explicate evidence of the crime scene.

IV.  Defendant was deprived of his Ams V and XIV rights of due process when a police officer testified, in effect, that alleged co-perpetrator Hasan Warlick was in custody.

V.   Defendant was denied his Ams V and XIV rights of due process of law and his right of confrontation by the trial court's erroneous decision to allow hearsay testimony which was inadmissible either as a statement by a co-conspirator or as a statement against interest.

13

VI.     Defendant was deprived of his Ams V and XIV rights of due process and his Am VI right of effective counsel because defense counsel was constitutionally ineffective in committing a major error when he asked a witness to whom the gun in question belonged and when he failed to follow through on the grant of a lineup.

VII.    Defendant's convictions should be reversed, and the charges dismissed, where he had become the victim of suggestive identification and was deprived of his Fifth and Fourteenth Amendment rights to due process of law, including his right to counsel, resulting in an obvious miscarriage of justice, when the police induced a witness into identifying Defendant as the assailant, from a choice of two, by conducting a show up identification exhibit, in the absence of counsel, and in which the police placed a hat on Defendant's head and not on the other suspect's head.

VIII.   The procedure utilized by the State to secure Defendant's waiver of his right to a preliminary examination was so offensive to the Fifth and Fourteenth Amendment requirements of due process that it amounted to a jurisdictional defect requiring reversal of his conviction.

IX.     Defendant's conviction on all charges should be reversed, where absent the tainted identification, there was insufficient evidence to sustain a finding of guilt beyond a reasonable doubt on every element of the crimes charged.

X.      The prosecutor's office engaged in prosecutorial misconduct, denying Defendant his Fifth Amendment right to a fair trial, when it (1) induced Defendant into waiving his preliminary examination in exchange for a corporeal line-up which it never intended to provide; (2) provided false and/or misleading information to the court in an effort to deny Defendant the line-up that was promised to him; and (3) belittled defense counsel, and counsel's trial tactics and defense, in the eyes of the jury.

XI.   Defendant was deprived of his Sixth Amendment right to effective assistance of counsel when trial counsel failed to sufficiently investigate, prepare, and present his only defense; where counsel failed to locate, consult with, or prepare available witnesses; where counsel failed to properly prepare and present critical motions; where counsel failed to obtain and/or utilize critical impeachment material; where counsel failed to object to damaging prosecutorial comments. In short, counsel failed to insure that his client's right to a fair trial was adequately protected.

XII.   The trial court abused its discretion in failing to properly instruct the jury for accessory after the fact, aiding and abetting, and/or mere presence as a lesser included offense instruction as requested by counsel.

XIII.   There was insufficient evidence to convict Defendant of assault with a dangerous weapon even though the trial court gave an erroneous instruction that shifted the burden of proof, and the charges of assault with a dangerous weapon and possession of a firearm during the commission of that felony violated the double jeopardy provision of the State and Federal Constitution.

XIV.   The Court of Appeals erred in not granting Defendant's motion to remand.

The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. McMillian*, No. 126405, Order (Mich., Dec. 29, 2004).

Petitioner subsequently filed in the trial court a motion for relief from judgment, which was denied on February 3, 2005.[1]  *People v. McMillian*, No. 02-2118-FH, Order (Calhoun County Cir. Ct., Feb. 3, 2005).  Petitioner appealed this determination to the Michigan Court of

---

[1]   It is not clear from the record what issues Petitioner asserted in this motion.

15

Appeals.[2]  The Michigan Court of Appeals denied Petitioner's request "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. McMillian*, No. 261759, Order (Mich. Ct. App., Oct. 14, 2005).  Asserting the following claims, Petitioner moved in the Michigan Supreme Court for leave to appeal:

> I.      Defendant demonstrated his entitlement to the relief requested under MCR 6.508(D)(3), since he raised these issues in the court of appeals and the supreme court, both refused to accept them for filing and he is actually innocent of the crime.

> II.     Defendant's conviction for assault with a dangerous weapon should be reversed and dismissed for violation of the double jeopardy provisions of the state and federal constitutions; the evidence to convict him for assault with a dangerous weapon was insufficient to convict him and he was denied his Sixth Amendment right to effective assistance of counsel.

The court denied Petitioner's request because he "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. McMillian*, No. 129772, Order (Mich., Dec. 27, 2005).  On January 23, 2006, McMillian initiated the present action, asserting the following claims:

> I.      Petitioner's conviction for assault with a dangerous weapon should be reversed and dismissed for violation of the double jeopardy provisions of the state and federal constitutions; the evidence to convict him for assault with a dangerous weapon was insufficient to convict him and he was denied his Sixth Amendment right to effective counsel at trial and on appeal.

> II.     Petitioner was entitled to the relief requested under

---

[2]    Again, it is not clear from the record what issues Petitioner asserted in this motion.

16

MCR 6.508(D)(3), since he raised these issues in the court of appeals and the supreme court, but both refused to accept them for filing and he is actually innocent of the crimes.

III.    The prosecutor's office engaged in prosecutorial misconduct, denying Petitioner his Fifth Amendment right to a fair trial, when it (1) induced Petitioner into waiving his preliminary examination in exchange for a corporeal line-up which it never intended to provide; (2) provided false and/or misleading information to the court in an effort to deny Petitioner the line-up that was promised to him; and (3) belittled defense counsel, and counsel's trial tactics and defense, in the eyes of the jury.

IV.    Defendant was deprived of his Ams V and XIV rights of due process and his Am VI right of effective counsel because defense counsel was constitutionally ineffective in committing a major error when he asked a witness to whom the gun belonged and when he failed to follow through on the grant of a lineup.

V.    Petitioner was deprived of his XIV rights of equal protection and his Am VI right to a fair trial when the prosecutor preemptorily challenged an African-American based on race.

VI.    Petitioner was deprived of his Ams V and XIV rights of due process when the trial court denied his motion to suppress out of court identification.

VII.    Petitioner's conviction should be reversed, and the charges dismissed, where he was the victim of suggestive identification and deprived of his Fifth and Fourteenth Amendment rights to due process of law, including his right to counsel, resulting in an obvious miscarriage of justice, when the police induced a witness into identifying Petitioner as the assailant, from a choice of two, by conducting a show up identification exhibit, in the absence of counsel, and by placing a hat on Petitioner's head and not on the other suspect's head.

17

VIII.   Petitioner was deprived of his Ams V and XIV rights of due process when a witness was permitted to repeatedly explicate evidence of the crime scene.

IX.   Petitioner was deprived of his Sixth Amendment right to effective assistance of counsel when trial counsel failed to sufficiently investigate, prepare, and present his only defense; where counsel failed to locate, consult with, or prepare available witnesses; where counsel failed to properly prepare and present critical motions; where counsel failed to obtain and/or utilize critical impeachment material; where counsel failed to object to damaging prosecutorial comments. In short, counsel failed to insure that his client's right to a fair trial was adequately protected.

X.   The procedure utilized by the State to secure Petitioner's waiver of his right to a preliminary examination was so offensive to the Fifth and Fourteenth Amendment requirements of due process that it amounted to a jurisdictional defect requiring reversal of his conviction.

XI.   Petitioner's conviction on all charges should be reversed, where absent the tainted identification, there was insufficient evidence to sustain a finding of guilt beyond a reasonable doubt on every element of the crimes charged.

## **STANDARD OF REVIEW**

McMillian's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

18

      (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

      (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at \*4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

For a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot rely on lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000). Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

The deferential standard articulated by the AEDPA does not apply if the state has failed altogether to review a particular claim. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning,

20

to which [the] court can defer." In such circumstances, the court conducts a *de novo* review. *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

I.          **Identification Procedure**  (Habeas Claims VI and VII)

As discussed above, shortly after the robbery of Stimac's Grocery, Joseph Johnson and Danielle Kane were transported to the location where the vehicle in which Petitioner had been riding was stopped. After separately viewing Petitioner and the driver of the vehicle, Kane identified Petitioner as the man who had robbed the grocery only a few minutes earlier. Petitioner asserts that because Kane's identification of him was impermissibly suggestive the admission at trial of her identification testimony violated his constitutional right to due process of law.

It has long been accepted that "[t]he admission of evidence derived from a suggestive identification procedure violates a defendant's right to due process if the confrontation leading to the identification was 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967) and citing *Neil v. Biggers*, 409 U.S. 188, 197 (1972)). Due process is violated, however, only when "the identification evidence is so unreliable that its introduction renders a trial unfair." *Smith v. Perini*, 723 F.2d 478, 482 (6th Cir. 1983). Absent "a very substantial likelihood of irreparable misidentification,"

21

identification evidence "is for the jury to weigh."  *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).

To determine whether the admission of identification testimony constitutes a due process violation, a court must undertake a two-step inquiry.  *Haliym*, 492 F.3d at 704.  It must first be determined whether the identification was "unnecessarily suggestive." *Id.*  If such is the case, the court must consider "whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure."  *Id.*  In making this assessment, the Court must examine the circumstances surrounding the challenged identification and not attempt to discern the intent of the police officers or other officials who arranged the identification procedure.  *See Howard v. Bouchard*, 405 F.3d 459, 470 (6th Cir. 2005) (the court must "look to the effects of the circumstances of the pretrial identification, not whether law enforcement officers intended to prejudice the defendant"); *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986) ("the deterrence of police misconduct is not the basic purpose for excluding identification evidence").

Determining whether an identification procedure is unnecessarily suggestive "depends upon whether the witness's attention was directed to a suspect because of police conduct." *Id.*  If the identification procedure is found to be unnecessarily suggestive, the court must determine "whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." *Id.* (quoting *Manson*, 432 U.S. at 107).  When considering whether a suggestive identification is nonetheless reliable, the Court must consider the following factors: (1) the witness' opportunity to view the suspect; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the time of the identification; and (5) the time between the crime and the identification. *Haliym*, 492 F.3d at 704 (citing *Manson*, 432 U.S. at 114 and *Neil*, 409 U.S. at 199-200).

While there is no evidence that the police prompted or encouraged Johnson or Zane to make a positive identification, or otherwise acted improperly in the execution of the show up procedure, there is no question that Johnson and Zane were directed to Petitioner and his accomplice "because of police conduct." By focusing its analysis on the various reliability factors identified above, the Michigan Court of Appeals appears to have concluded that the show up procedure in this case was unnecessarily suggestive. *People v. McMillian*, No. 244711, Opinion at 2-3 (Mich. Ct. App., May 6, 2004). This is certainly a reasonable conclusion. However, even assuming that the identification procedure in question was unnecessarily suggestive, the totality of circumstances does not support Petitioner's argument that Kane's identification of him was unreliable.

Danielle Kane testified that when the robber entered the grocery she looked him in the face and said, "hi, how are you today?" (Trial Transcript, Sept. 18, 2002, 259-60). The man responded, "good," and then walked to where Joseph Johnson was working. (Tr. 259). Kane was standing "an arm's length" from the man when she spoke with him. (Tr. 260). Kane observed that the man was wearing a ball cap and a black jacket with green writing on the back. (Tr. 262, 266). Kane testified that because the grocery had been robbed previously she attempted to "look at everyone" and "speak to everyone" that entered the grocery. (Tr. 266). Thus, the first two factors, the witness' opportunity to view the suspect and the witness' degree of attention, both favor a finding of reliability. *See Haliym*, 492 F.3d at 705 (the reliability of an identification is increased where the witness "was able to view the assailant with a heightened degree of attention, as compared with disinterested bystanders or casual observers").

The third factor does not appear to be relevant because the record is unclear as to the nature of any description of the robber that Danielle Kane provided officers prior to participating in

the show up procedure.  Officer Lance Barbre testified that when he investigated the robbery he was given a description of the robber, however, it is not clear whether this description was offered by Danielle Kane, Joseph Johnson, or was a synthesis of their individual recollections.  (Trial Transcript, Sept. 18, 2002, 371-72).

The fourth and fifth factors also favor a finding of reliability.  As indicated above, Kane testified that she was unable to identify the first man at the show up, but that when she observed Petitioner, she "was sure that was him."  (Tr. 267-72).  Finally, the show up procedure occurred almost immediately after the robbery.

Plaintiff asserts that Kane's identification was fatally tainted by the fact that as part of the show up procedure he was forced to wear a hat while his accomplice was not.  The Court disagrees.  As indicated previously, Kane positively identified Petitioner before asking the officers to place the hat on Petitioner's head.  There is no evidence that the police made the decision to display Petitioner wearing a hat or that the police even informed Kane that Petitioner was wearing a hat when he was captured.  As Kane testified, she asked the officers to place the hat on Petitioner's head because she simply wanted to "reassure" herself that she was correct.  Such does not detract from the reliability of Kane's identification.

The Michigan Court of Appeals determined that the admission at trial of Danielle Kane's identification testimony did not violate Petitioner's due process rights.  *People v. McMillian*, No. 244711, Opinion at 2-3 (Mich. Ct. App., May 6, 2004).  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue

24

upon which habeas relief may be granted.

II.　　　　　**Sufficiency of the Evidence**　(Habeas Claim XI)

Petitioner asserts that he is entitled to habeas relief because "absent the tainted identification evidence, there was insufficient evidence to sustain a finding of guilt on any charge."

Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

When determining whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Pursuant to Michigan law in effect as of May 9, 2002, an individual was guilty of armed robbery if the following elements were satisfied: (1) an assault; (2) a felonious taking of property from the victim's presence or person; (3) while the defendant is armed with a weapon described in the statute. *See People v. Rodgers*, 645 N.W.2d 294, 298 (Mich. Ct. App. 2002). It

25

does not matter whether the victim "actually owned the property taken," as the prosecution need only establish that the property was taken from the victim's presence and that "the victim's right to possess the property was superior to the defendant's right to possess it." *Id.*

Pursuant to Michigan law then in effect, an individual was guilty of felonious assault if the following elements were satisfied: (1) an assault; (2) with a dangerous weapon; (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery. *See People v. Burks*, 2002 WL 652422 at *1 (Mich. Ct. App., April 19, 2002). Finally, an individual was guilty of possession of a firearm during the commission of a felony if he possessed a firearm during the commission of or attempted commission of any felony, except for those felonies specifically enumerated by statute (none of which are presently applicable). *See People v. Mitchell*, 575 N.W.2d 283, 284-85 (Mich. 1998).

First, while Petitioner asserts that the identification evidence introduced at trial was "tainted," as discussed above, this evidence was properly admitted against Petitioner. When viewed in a light most favorable to the prosecution, the evidence introduced at trial is more than sufficient to support Petitioner's conviction for armed robbery, felonious assault, and possession of a firearm during the commission of each of these crimes.

The Michigan Court of Appeals concluded that this claim was "without merit." *People v. McMillian*, No. 244711, Opinion at 7 (Mich. Ct. App., May 6, 2004). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

III.            **Juror Challenge**  (Habeas Claim V)

Petitioner asserts that the prosecutor improperly exercised one of his peremptory challenges to dismiss an African-American juror on racial grounds.  Petitioner asserts that the prosecutor's conduct violated his constitutional right to equal protection and a fair trial.

A criminal defendant's right to equal protection of the laws is violated when a prosecutor engages in "[p]urposeful racial discrimination" in the selection of the jury.  *Batson v. Kentucky*, 476 U.S. 79, 86 (1986).  Accordingly, when selecting a jury, a prosecutor may not exercise her peremptory challenges in racially discriminatory manner.  *See Valentine v. United States*, 488 F.3d 325, 338 (6th Cir. 2007).

When evaluating a claim that a prosecutor exercised a peremptory challenge in a racially discriminatory manner, courts must employ the following three step analysis: (1) the defendant must first establish a prima facie case that the prosecutor exercised her peremptory challenges on the basis of race; (2) if the defendant makes this showing, the prosecutor must articulate a race-neutral rational for her peremptory challenges; and (3) if the prosecutor satisfies this requirement, the trial court must then determine whether the defendant has nonetheless established that the prosecutor acted with "purposeful discrimination."  *See Snyder v. Louisiana*, 128 S.Ct. 1203, 1207 (2008) (citations omitted).

The defendant can prevail at step three of the analysis by establishing that the prosecutor's "proffered explanation is merely a pretext for racial motivation."  *United States v. Odeneal*, 517 F.3d 406, 413 (6th Cir. 2008).  With respect to the third step of this analysis, the Supreme Court has observed that

The trial court has a pivotal role in evaluating *Batson* claims.  Step

27

three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, and the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge. In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's first-hand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province, and we have stated that in the absence of exceptional circumstances, we would defer to the trial court.

*Snyder*, 128 S.Ct. at 1208 (internal citations and quotations omitted).

Finally, it must be remembered that while the burden of *production* switches after each of the first two steps of this analysis, "the ultimate burden of *persuasion* regarding racial motivation rests with, and never shifts from, the opponent of the [peremptory] strike." *United States v. Kimbrel*, 532 F.3d 461, 466 (6th Cir. 2008) (quoting *Purkett v. Elem*, 514 U.S. 765. 768 (1995)).

In this case, the prosecution sought to exercise a peremptory challenge to remove an African-American member of the jury pool. (Trial Transcript, Sept. 17, 2002, 75). The trial judge did not require Petitioner to demonstrate that the challenge to this particular juror constituted prima facie evidence that the prosecutor's actions were motivated by race, but instead immediately asked the prosecutor whether he could articulate "a neutral reason not based upon race as to why this juror should be excused on a peremptory challenge." (Tr. 75-76). The following exchange then occurred (outside the presence of the jury pool):

>    Mr. Jaconette: Judge, it is my challenge and my reason is that on the questionnaire - and I did ask him in my questioning to him if all of his questions were properly answered, I believe. It states in answer number 18, "Have you ever been convicted of a misdemeanor other than traffic

28

violations?  Yes.  If yes, what?  Spousal abuse."

That's from his questionnaire dated 8/2/02 and that is my reason for excusing that juror.  I know I cannot do that for cause because it's not a felony but I don't wish to have any people convicted of criminal offenses on my jury and the reason for excusing him and no other reason than that.

The Court:    Okay.  Mr. Sullivan.

Mr. Sullivan:    I think the record reflects that this is a racial peremptory challenge, your Honor.  This potential juror is one of I think only two in this whole panel of prospective jurors and not one question was asked of this juror regarding the domestic violence and what are the facts and circumstances surrounding it, the impact it may or may not have with his position as a juror and one would think that if that was a factor to consider that some questions would have been asked of it and the fact that they aren't speaks more to color than anything else, and I want the record to reflect my client's position.

Mr. Jaconette:    Can I make one statement on that?

The Court:    Sure.  Go ahead.

Mr. Jaconette:    Judge, I have practiced in front of your Honor for many years now and I think the court is well aware of my practice in jury selection when I - black, white, whatever the race, when I have a potential member on a panel who has a felony conviction or any type of misdemeanor for whatever reason, my practice is not to embarrass that juror in front of his fellow panelists and, your Honor, I think will agree that my practice is to simply state for the reasons stated in the juror's questionnaire, we ask that the juror be thanked and excused and that's what I'm doing here.  I do not wish to air Mr. Love's dirty laundry out in public and I do not think as a practical matter it's necessary to go into the back room and speak with him.  He signed the paper stating that his answers are truthful and for that reason I'll take him at his written word and not seek to embarrass him in front of anyone else.

(Tr. 76-78).

The trial judge then questioned Mr. Love, outside the presence of the jury pool, but

29

in the presence of the prosecutor and Petitioner's counsel, about his conviction for spousal abuse.

(Tr. 79-85).  Mr. Love acknowledged that "probably about six, seven years ago" he had pleaded

guilty to spousal abuse.  (Tr. 80-84).  After questioning Mr. Love, the trial court asked the prosecutor

whether, after hearing Mr. Love, he had changed his mind about exercising a peremptory challenge

to remove Mr. Love.  (Tr. 86).  The prosecutor answered that he had not changed his mind and

further offered the following thoughts:

> Mr. Jaconette: Judge, just - the only other thing I'll indicate to the court is prior to
> every trial I go through these questionnaires and anyone who has a
> conviction or something that I have a problem with, I put a star next
> to their name and I have done that on a number of panelists in this
> case, one of them happened to be Mr. Love.  I didn't know at the time
> I put a star next to his name what race he was.  The fact that it turns
> out that he is African-American which is the same race as defendant
> is a fact, a coincidence but nothing that I foresaw when I put the star
> next to his name when I wanted to kick him off and that hasn't
> changed.  That's the reason for me wanting to kick him off.

(Tr. 86-87).

Petitioner offered no evidence that the prosecutor's stated rationale for seeking to

dismiss Mr. Love was merely a pretext and that the prosecutor was instead engaging in purposeful

racial discrimination.  The trial court concluded that the prosecutor's rationale was race neutral and

"does not appear to [the court] to be some kind of sham reason or pretext simply to remove a black

juror from the jury."  (Tr. 88-89).  With respect to this claim, the Michigan Court of Appeals

concluded that:

> On the facts of this case, we find that the trial court did not abuse its
> discretion when it found that the prosecutor articulated a race-neutral
> reason for his peremptory challenge, and that defendant had not
> proved purposeful racial discrimination.  Although the challenged
> juror was the only potential African-American juror seated on the
> panel, the prosecutor explained that his challenge to this juror was

based on the fact that the juror admitted in his juror questionnaire that he was previously convicted of a misdemeanor. Moreover, the prosecutor indicated that it was his practice for many years to excuse all potential jurors who had been convicted of a criminal offense. Further, the prosecutor explained that his decision to excuse the juror was made after reviewing the questionnaire, well before he ever saw the juror or was aware of his race. In light of these facts, we believe that an unprejudiced person, considering the facts on which the trial court acted, would not say that there was no justification or excuse for the ruling made. Therefore, the trial court did not abuse its discretion.

*People v. McMillian*, No. 244711, Opinion at 1-2 (Mich. Ct. App., May 6, 2004).

Petitioner offers no evidence suggesting that the decision by the Michigan Court of Appeals is incorrect or premised on inaccurate or incomplete facts. Accordingly, in light of the above authority and facts, the Court concludes that the decision by the Michigan Court of Appeals on this issue is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

**IV.        Preliminary Examination**  (Habeas Claim X)

On May 23, 2002, the trial court conducted a proceeding in which the following exchange occurred:

> The Court:     These are the cases of the State of Michigan versus Larry McMillian. Mr. McMillian is in court today with his attorney John Sullivan; the People are represented by Prosecutor Sarah Soules. These matters are scheduled for a preliminary examination today. The Court's received waivers of exam in both cases signed by defendant and his counsel. Ms. Soules, is there any objection on the part of the People to the waivers of exam?

Ms. Soules:    No objection, your Honor.

The Court:    Are there any terms or conditions of these waivers that need to be placed on the record?

Mr. Sullivan:    There is a plea offer, your Honor, which is an inducement for the waiver. And that is if my client were to enter a plea to armed robbery the habitual, the - and the other charges would be dismissed. As well as the felony firearm.

The Court:    All right. And, Ms. Soules, is that correct?

Ms. Soules:    That is correct, your Honor.

The Court:    Okay.

Mr. Sullivan:    Your Honor, there's an additional agreement between the Prosecutor and the defense and that is that upon the waiver I will present to her a stip and order to have a physical identification take place and that's something that we've agreed on as well.

The Court:    Is that correct, Ms. Soules?

Ms. Soules:    That is correct.

The Court:    All right. The waivers are accepted. The defendant is bound over to the Circuit Court on the charges in the complaint and the bonds are continued.

(Hearing Transcript, May 23, 2002, 2-3).

The promise of a physical identification (i.e., a lineup) referred to above never occurred. Petitioner asserts that the prosecutor violated his due process rights by persuading him to waive the preliminary examination in return for the unfulfilled promise of a corporeal lineup. Petitioner's claim is without merit.

First, contrary to Petitioner's assertion, the prosecution did not refuse Petitioner's request to participate in a corporeal lineup. At a July 25, 2002 hearing, Petitioner's counsel indicated

that an order regarding Petitioner's participation in a lineup had yet to issue because he (Petitioner's counsel) had not yet prepared an appropriate order. (Hearing Transcript, July 25, 2002, 7-8). As of September 10, 2002, a lineup had still not taken place, at which point Petitioner moved the trial court for an order that "a corporeal lineup be conducted in accordance with the agreement reached at the time of the bindover." (Hearing Transcript, Sept. 10, 2002, 49-50). In making this motion, Petitioner's counsel stated that a lineup had not yet taken place because, in addition to his failure to prepare an appropriate order, "there was a period of time as well that [Petitioner] was not interested in pursuing that relief." (Tr. 49). Finding that Petitioner's motion for a lineup, made only one week before the start of trial, was "too late," the court denied Petitioner's motion for a lineup. (Tr. 53-54).

In sum, there is absolutely no evidence in the record that Petitioner's inability to participate in a corporeal lineup was the result of any improper conduct on the part of the prosecutor. Rather, the record reveals such was the result of the failure by Petitioner's counsel to timely submit an appropriate order, Petitioner's desire not to participate in a lineup, and the trial court's denial of Petitioner's untimely motion. Moreover, even if the Court assumes that the prosecutor is at fault for not allowing Petitioner to participate in a corporeal lineup, such is of no consequence, as Petitioner enjoys no constitutional right to participate in a corporeal lineup. *See, e.g., Morris v. Giurbino*, 162 Fed. Appx. 769, 771 (9th Cir., Jan. 13, 2006) (observing that "the United States Supreme Court has never held that a criminal defendant has a constitutional right to a pretrial lineup").

Furthermore, even if the Court assumes that Petitioner was entitled to a preliminary examination or that the State's failure to afford Petitioner such an examination was improper, such does not entitle Petitioner to the relief he seeks. *See Gerstein v. Pugh*, 420 U.S. 103, 118-19 (1975) ("Nor do we retreat from the established rule that illegal arrest or detention does not void a

subsequent conviction.  Thus, as the Court of Appeals noted below, although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause") (citations omitted).

The Michigan Court of Appeals concluded that Petitioner's due process rights were not violated by his inability to participate in a lineup or a preliminary examination.  *People v. McMillian*, No. 244711, Opinion at 6 (Mich. Ct. App., May 6, 2004).  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

**V.**          **Prosecutorial Misconduct**  (Habeas Claim III).

Petitioner asserts that the prosecutor engaged in misconduct by engaging in the following: (1) inducing Petitioner into waiving a preliminary examination in exchange for a corporeal lineup which he never intended to provide; (2) providing false and/or misleading information to the court in an effort to deny Petitioner the lineup he was promised; and (3) belittling defense counsel and his trial tactics in the eyes of the jury.

As the Sixth Circuit has stated, "[w]hen a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor.'"  *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  The issue is whether the prosecutor's conduct

34

"so infected the trial with unfairness as to make the resulting conviction a denial of due process."
*Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168,
181 (1986)).

Thus, even if the challenged comments were improper, habeas relief is available only
where the comments "were so flagrant as to render the entire trial fundamentally unfair." *Gillard*,
445 F.3d at 897. When assessing whether an improper comment resulted in a denial of the right to
a fair trial, the Court must consider the following factors: (1) the likelihood that the comments
mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3)
whether the remarks were deliberately or accidentally presented to the jury; and (4) whether the
evidence against the accused was substantial. *Id.*

A.      Lineup and Preliminary Examination

As discussed above, the record contains no evidence that the prosecutor acted
improperly with respect to Petitioner's decision to voluntarily waive the preliminary examination
or Petitioner's subsequent inability to participate in a corporeal lineup. Moreover, Petitioner has
presented no evidence that the prosecutor "never intended to provide" Petitioner with a corporeal
lineup. As noted above, Petitioner's failure to secure a lineup was the result of his own attorney's
shortcomings as well as Petitioner's desire *not* to participate in a lineup.

As for Petitioner's claim that the prosecutor provided false and/or misleading
information to the trial court in an effort to deny his pre-trial motion to participate in a lineup, the
Court is unpersuaded. Petitioner cites to the prosecutor's argument that a lineup was unnecessary
because "we did have the show-up identification where [Petitioner] was immediately identified by

both victims." (Hearing Transcript, Sept. 10, 2002, 51). Petitioner asserts that this argument is "false and/or misleading" because in his opening statement to the jury the prosecutor indicated that Joseph Johnson was not able to identify Petitioner at the show up procedure. (Trial Transcript, Sept. 17, 2002, 144).

While the prosecutor's argument at the motion hearing differed from the comments he made in his opening statement to the jury, such hardly constitutes misconduct. The argument the prosecutor made at the motion hearing was consistent with the evidence presented at the hearing. Officer Cipcic testified at the hearing that he did not know whether Joseph Johnson or Danielle Kane identified Petitioner at the show up. (Hearing Transcript, Sept. 10, 2002, 12, 21). Officer Schwarz testified that Johnson and Kane both identified Petitioner at the show up as the man who robbed the grocery. (Tr. 27-29).

The prosecutor's argument, therefore, was entirely consistent with the evidence presented at the motion hearing. Petitioner has presented no evidence that the prosecutor, when he argued against Petitioner's motion, was aware that Johnson would testify at trial that he had not, in fact, identified Petitioner at the show up. It is likely that the prosecutor did not learn of this until after the motion hearing when speaking with Johnson in preparation for trial. Petitioner certainly had the opportunity to question Johnson (or any other witness) at the motion hearing and present his own argument regarding such evidence. Petitioner's conscious failure to present such evidence hardly constitutes misconduct on the part of the prosecutor.

B.    Comments to Jury

Petitioner asserts that the prosecutor engaged in misconduct when he "belittled [Petitioner's] entire defense" and referred to defense counsel as a "trial lawyer who's doing what he has to do." Petitioner has failed to cite to any portion of the record where the allegedly improper comments were made.

The Court has located no record of the prosecutor making the statement that Petitioner's counsel was a "trial lawyer who's doing what he has to do." The Court did locate, however, the following comment made by the prosecutor in his rebuttal argument:

> The evidence here is overwhelming. You have eyewitness testimony linking this person to the crime. Defense counsel does what he has to do when he pounds the table. He does what he has to do and that is to try to get you as hard as you can to discount everything that Danielle Kane says because he has to do that because you have to think that Danielle Kane is completely mistaken to acquit his client. You have to. If you believe her, he's guilty.

(Trial Transcript, Sept. 19, 2002, 495).

Perhaps this is the comment to which Petitioner is referring. As this comment reveals, the prosecutor did not attempt to denigrate defense counsel with the epithet "trial lawyer" as Petitioner asserts, but instead made entirely appropriate comments concerning the evidence presented at trial and Petitioner's arguments regarding such. *See, e.g., United States v. Collins*, 78 F.3d 1021, 1039-1040 (6th Cir. 1996) (the prosecutor "must be given leeway to argue reasonable inferences from the evidence"); *United States v. Reliford*, 58 F.3d 247, 250-51 (6th Cir. 1995) (so long as he does not improperly vouch for a witness, it is proper for the prosecutor to review the evidence presented and comment on the strength of the State's case).

While Petitioner has failed to identify any citations to the record to support his vague

37

assertion that the prosecutor "belittled [his] entire defense," the Court has carefully reviewed the entire record in this matter and finds no evidence that the prosecutor made any improper comments or arguments in this matter.

The Michigan Court of Appeals determined that Petitioner's prosecutorial misconduct claims were without merit. *People v. McMillian*, No. 244711, Opinion at 7-9 (Mich. Ct. App., May 6, 2004). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## VI.           **Videotape Evidence**  (Habeas Claim VIII)

Petitioner asserts that his due process rights were violated by the repeated presentation at his trial of the surveillance video of the robbery. Petitioner asserts that the video was shown seven times during his trial, but has identified only three instances in which the video was allegedly played for the jury: (1) during Joseph Johnson's testimony; (2) during Danielle Kane's testimony; and (3) during the prosecutor's closing argument. Petitioner also claims that the use by the prosecutor of a diagram of the crime scene violated his constitutional rights.

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Habeas relief is warranted, however, if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir.

1994) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  This requires Petitioner to demonstrate "actual prejudice" resulting from a constitutional error.  *Clemmons*, 34 F.3d at 357.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States.  *Id.*  In this respect, it is recognized that "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief."  *Bugh*, 329 F.3d at 512; *see also*, *Norris v. Schotten*, 146 F.3d 314, 328-29 (6th Cir. 1998) (citing *Estelle*, 502 U.S. at 67-68).

Fundamental fairness does not, however, "require a perfect trial," *Clemmons*, 34 F.3d at 358, and courts have defined those violations which violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512.  State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Id.* (citations omitted).

During their testimony, Joseph Johnson and Danielle Kane referred to a diagram of the crime scene when discussing their actions and/or what they witnessed.  (Trial Transcript, Sept. 18, 2002, 235-37, 259-60).  Petitioner asserts that use of this diagram violated his right to due process. The basis for Petitioner's claim is far from clear.  Petitioner does not allege that the diagram was inaccurate or otherwise improper, nor does Petitioner allege that he was prevented from using the diagram.  The Court fails to discern how Petitioner's rights were violated by permitting eyewitnesses to a crime to use a diagram to help explain for the jury what they witnessed or what actions they took.

The Court likewise fails to discern how the use of the surveillance video at Petitioner's trial violated his rights. The video was first played during Joseph Johnson's testimony. (Trial Transcript, Sept. 18, 2002, 249-54). Johnson testified concerning the items and events recorded by the surveillance equipment. (Tr. 251-54). Johnson also testified that the videotape depicted the robbery as it actually happened. (Tr. 253). Contrary to Petitioner's assertion, the video was not shown during Danielle Kane's testimony. (Tr. 276). Kane testified only that she had viewed the surveillance video previously and it accurate represented what occurred during the robbery. (Tr. 276). Finally, the prosecutor played the video a second time for the jury during his closing argument. (Trial Transcript, Sept. 19, 2002, 465-67).

Petitioner has not identified (and the Court has not discovered) any other instance where the surveillance video was played in the jury's presence. Contrary to Petitioner's claim that the jury was shown the video seven times, the record reveals that the video was played for the jury only twice - once during the testimony of an eyewitness to the crime and again during closing argument. The Court fails to discern how such was unfair to Petitioner or violated his rights. As the Michigan Court of Appeals correctly observed, "there can hardly be any more probative evidence than the accurate and true depiction of the crimes with which defendant was charged." *People v. McMillian*, No. 244711, Opinion at 4 (Mich. Ct. App., May 6, 2004). While the Court recognizes that the repeated presentation of even relevant and probative evidence could, in certain circumstances, warrant habeas relief, the prosecutor's use of the surveillance video in this case was neither repetitive nor gratuitous.

The Michigan Court of Appeals concluded that Petitioner's due process rights were not violated by the use of the surveillance video or the use of a diagram of the crime scene. *People*

*v. McMillian*, No. 244711, Opinion at 3-4 (Mich. Ct. App., May 6, 2004).  In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

**VII.**          **Ineffective Assistance of Counsel**  (Habeas Claims IV and IX)

Petitioner asserts that he is entitled to habeas relief because his trial counsel rendered ineffective assistance.  Specifically, Petitioner claims that his attorney was ineffective for: (1) asking Officer Barbre who the gun used in the robbery belonged to; (2) failing to secure a corporeal lineup; (3) failing to question Danielle Kane at the suppression hearing; (4) failing to question at trial various individuals; (5) failing to timely obtain fingerprint evidence; (6) failing to object to improper comments by the prosecutor.

To establish that he was denied the right to the effective assistance of counsel, Petitioner must establish that his counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Accordingly, Petitioner must demonstrate that his attorney's actions were unreasonable under prevailing professional norms.  *Id.* at 688.  In assessing such a claim, however, the Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id.* at 689.

Petitioner must further establish that he suffered prejudice as a result of his attorney's

allegedly deficient performance.  Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).  This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

A.      Question to Officer Barbre

On cross-examination of Officer Barbre the following exchange occurred between Petitioner's counsel and Officer Barbre:

Counsel:      Do you know whose gun that was, Exhibit No. 2?

Barbre:       According to witness statements, it belonged to the robber.

Counsel:      Do you know whose gun it is, though, which of the two suspects if either one of them in that car, do you know whose gun that is?

Barbre:       According to witness statements and everything through my investigation and the confession by Mr. Warlick,[3] it belonged to Mr. McMillian.

(Trial Transcript, Sept. 18, 2002, 383-84).

Petitioner asserts that counsel was ineffective for eliciting testimony that the gun used in the robbery belonged to him.  Even if the Court assumes that counsel was ineffective for eliciting this testimony, Petitioner cannot establish that he was prejudiced thereby.  Ownership of the weapon used in the robbery was not an element of any of the crimes for which Petitioner was convicted.

---

[3]  This apparently refers to Hasan Warlick, the man who was captured with Petitioner immediately following the robbery.

Who *owned* the weapon was not relevant. Instead, what was relevant was who *possessed* the weapon while robbing the grocery. With respect to this latter point, the evidence against Petitioner was overwhelming and was not affected by this brief exchange concerning an irrelevant issue.

The Michigan Court of Appeals declined to address this issue because it was "unpreserved for appellate review." *People v. McMillian*, No. 244711, Opinion at 5 n.1 (Mich. Ct. App., May 6, 2004). As previously noted, in such a circumstance the Court evaluates the claim de novo. In light of the above facts and legal authority, the Court finds this claim to be without merit.

### B.      Failure to Secure Corporeal Lineup

Petitioner asserts that his trial attorney was ineffective for failing to secure Petitioner's participation in a corporeal lineup. As discussed previously, Petitioner's counsel did attempt to secure a line up for Petitioner, but was thwarted in part by Petitioner's desire not to participate in a corporeal lineup. With respect to this claim, the Michigan Court of Appeals, noting this fact, denied Petitioner's claim on the ground that Petitioner "has failed to demonstrate that trial counsel's conduct was objectively deficient." *People v. McMillian*, No. 244711, Opinion at 4-5 (Mich. Ct. App., May 6, 2004).

The Court finds that this determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Moreover, even if the Court were to find that counsel's performance was deficient, Petitioner cannot demonstrate that he was prejudiced by counsel's alleged shortcoming. As discussed above, Danielle Kane's identification testimony was reliable and properly admitted. Petitioner's belief that a

corporeal lineup would have exonerated him is based on nothing more than speculation.  Habeas relief cannot rest on mere speculation.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

### C.      Failure to Question Danielle Kane at the Suppression Hearing

Prior to trial, Petitioner moved to suppress identification testimony from Danielle Kane concerning the show up procedure performed immediately after Petitioner and his accomplice were captured.  As previously observed, the only two people that testified at this hearing were Officer Cipcic and Officer Schwarz.  Petitioner asserts that his attorney rendered ineffective assistance by failing to question Danielle Kane at the suppression hearing.

Even if the Court assumes that counsel was ineffective for failing to question Kane (or anybody else) at the suppression hearing, Petitioner offers no evidence to suggest that such questioning would have resulted in a different outcome.  The Michigan Court of Appeals denied this particular claim, noting that Petitioner had failed to demonstrate that even "if counsel had called witnesses on defendant's behalf, it would in any way have made a difference in the outcome." *People v. McMillian*, No. 244711, Opinion at 5 (Mich. Ct. App., May 6, 2004).  The Court finds that this determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

D.      Failure to Question Certain Witnesses

Petitioner claims that his counsel was ineffective for failing to call the following individuals to testify at trial: (1) James, a man allegedly mentioned in a police report as having witnessed "the robber run from the store and get into the getaway car;" (2) Jim Nemrava, the man who owned the vehicle in which Petitioner was captured; (3) Gulius Hollis, a man who had allegedly told defense counsel that the weapon used in the robbery belonged to Hasan Warlick.

1.      James

As noted above, Kenneth Moorehead testified that after Joseph Johnson exited the grocery and informed him that the grocery had just been robbed, a man approached Moorehead and Johnson and stated that the robber "went and got in that black car there." (Trial Transcript, Sept. 18, 2002, 306-10). Officer Barbre testified that when he later returned to the grocery he was unable to locate this man, but was informed that the man's name was James. (Tr. 387-88). Petitioner speculates that "it is quite possible" that James would have provided exculpatory testimony that Petitioner was not the robber. Even if the Court assumes that it constituted deficient performance for counsel not to locate and call this witness to testify, Petitioner has no evidence that James' testimony would have been favorable to him or lead to a different outcome. Petitioner merely speculates that such would have been the case.

2.      Jim Nemrava

Petitioner asserts that Nemrava would have testified that it was Hasan Warlick "who borrowed the car and failed to return it." Petitioner has no evidence that Nemrava would have

provided this testimony.  Moreover, the Court fails to discern how such testimony would have advanced Petitioner's cause.  There was no dispute that Hasan Warlick was driving the getaway vehicle when Petitioner and Warlick were captured.  Furthermore, who borrowed the vehicle from Nemrava was not a relevant issue at Petitioner's trial.  Thus, even if counsel was ineffective for failing to question Nemrava at trial, Petitioner has failed to demonstrate that this alleged failure resulted in prejudice.

> 3.      Gulius Hollis

Petitioner asserts that Hollis would have testified that the weapon used in the robbery belonged to Hasan Warlick.  Petitioner has submitted no evidence that Hollis would have provided this testimony.  The Court also fails to discern how such testimony would have benefitted Petitioner.  As previously discussed, the *ownership* of the weapon used in the robbery was not relevant in this matter.  Accordingly, even if counsel was ineffective for failing to question Hollis at trial, Petitioner has failed to demonstrate that this alleged failure prejudiced his defense.

The Michigan Court of Appeals denied Petitioner's claim that his attorney rendered ineffective assistance by failing to question these individuals at trial.  *People v. McMillian*, No. 244711, Opinion at 5 (Mich. Ct. App., May 6, 2004).  This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

E.        Failure to Timely Obtain Fingerprint Evidence

On the first day of trial, Petitioner's counsel was provided with the results of a fingerprint analysis performed on the weapon and bottle of Hennessy recovered from the vehicle in which Petitioner was captured.  (Trial Transcript, Sept. 17, 2002, 132).  According to this report, Petitioner's fingerprints were not found on either item.  (Tr. 135).  Petitioner claims that his attorney was ineffective for not obtaining this report sooner.

There is no evidence that the failure by the prosecutor to disclose the results of the fingerprint analysis in a more timely manner is attributable to Petitioner's counsel.  The record reveals that counsel specifically requested the results of any fingerprint analysis long before Petitioner's trial.  (Hearing Transcript, July 25, 2002, 3-4).  Even if counsel's actions in this regard were somehow deficient, the Court fails to discern how Petitioner was prejudiced.  In other words, Petitioner has failed to demonstrate that the outcome in this matter would have been any different had he received the results of the fingerprint analysis in a more timely manner.  This evidence was favorable and provided to Petitioner before the trial began.  As the trial judge noted, "the nature of the information is such that it doesn't present the kind of problems I would think that show up when the prosecutor presents a late report implicating the defendant in a crime which could, of course, have quite a prominent impact on the particular case and how it's prepared." (Trial Transcript, Sept. 17, 2002, 135-36).

The Michigan Court of Appeals found this claim to be without merit.  *People v. McMillian*, No. 244711, Opinion at 5-6 (Mich. Ct. App., May 6, 2004).  This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of

47

the evidence presented.  Thus, this claim raises no issue upon which habeas relief may be granted.

F.      Failure to Object to Improper Comments

Petitioner asserts that his counsel rendered ineffective assistance by failing to object to the prosecutor's "belittling" comments to the jury.  As discussed above, the prosecutor did not make any improper comments the jury.  Counsel's failure to object to such comments cannot, therefore, be considered deficient.

The Michigan Court of Appeals found this claim to be without merit.  *People v. McMillian*, No. 244711, Opinion at 6 (Mich. Ct. App., May 6, 2004).  This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented.  Thus, this claim raises no issue upon which habeas relief may be granted.

VIII.       **Procedurally Defaulted Claims**  (Habeas Claims I and II)

Petitioner has procedurally defaulted claims I and II presented in the present petition.  As noted above, these claims were presented to the Michigan Supreme Court in Petitioner's post-conviction motion for relief.  The court declined to address these claims because of Plaintiff's failure to comply with Michigan Court Rule 6.508(D).

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address Petitioner's claims because of a failure to satisfy state procedural requirements.  *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  Where Petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate

state ground precluding review by a federal court.  *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).

The Sixth Circuit employs a multi-part test to determine if a petitioner has procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply, (2) the state court must have actually enforced the state procedural rule, and (3) the default must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim.  *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004).

It must be remembered, however, that for the procedural default doctrine to apply, "the last state court rendering a judgment in the case must have based its judgment on the procedural default."  *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000).  Furthermore, review by a state court of a procedurally defaulted claim to prevent manifest injustice does not constitute a review on the merits sufficient to excuse procedural default.  *See Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) ("a state court's plain error analysis does not save a petitioner from procedural default").

If Petitioner has procedurally defaulted a particular claim, federal habeas review is available only if he can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice.  *See Bagley*, 380 F.3d at 966 (citing *Coleman*, 501 U.S. at 750).

With respect to cause, Petitioner must demonstrate the existence of some objective factor, external to the defense, which impeded his efforts to comply with the applicable procedural rule.  *See Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Johnson v. Wilson*, 187 Fed. Appx. 455, 458 (6th Cir., June 16, 2006).  To establish that a miscarriage of justice would result from the failure to

review his procedurally defaulted claims, Petitioner must make a "colorable showing of factual innocence." *McCleskey v. Zant*, 499 U.S. 467, 495 (1991). To satisfy this requirement Petitioner must demonstrate the existence of new and reliable evidence, not presented at trial, which establishes that some constitutional error "probably resulted" in the conviction of an innocent person. *See Schlup v. Delo*, 513 U.S. 298, 324-27 (1995). The evidence must show that it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 326-27.

Michigan Court Rule 6.508 provides that a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been raised in a prior appeal. M.C.R. 6.508(D)(2)-(3). With respect to claims which could have been raised in a prior appeal, a defendant is entitled to relief only if he can establish both "good cause" for failing to assert the issue previously and "actual prejudice" resulting therefrom. M.C.R. 6.508(D)(3). In this context, "actual prejudice" is defined as a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand." M.C.R. 6.508(D)(3)(a)-(b).

The Sixth Circuit has held that denial of leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," constitutes a sufficient determination that the court's conclusion was based on procedural default. *See Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002). Furthermore, Rule 6.508(D), regularly followed since 1990, constitutes an independent and adequate state ground, the reliance on which precludes federal review of those issues against which it is applied. *Simpson*, 238 F.3d at 407.

Petitioner advances three arguments in support of his position that application of the procedural default doctrine is inappropriate. First, Petitioner claims that he did, in fact, present these

50

issues in his direct appeal.  Petitioner asserts that as part of his direct appeal he presented these issues to the Michigan Court of Appeals in a second supplemental brief.  Petitioner asserts that this pleading was rejected on the ground that he was permitted to file only one supplemental pleading. Even assuming this is accurate, Petitioner has not asserted that he subsequently presented these claims to the Michigan Supreme Court on direct appeal.  Thus, this argument does not support Petitioner's position.

Petitioner also claims that his procedural default should be excused due to the failure by his attorney to ensure that the claims in question were properly presented on direct appeal.  This argument fails because even assuming counsel's alleged failure establishes the requisite cause, Petitioner cannot establish that he was prejudiced by counsel's action, as these claims are without merit.  Finally, Petitioner claims that failure to address the merits of these claims will result in a fundamental miscarriage of justice because he is actually innocent of the crimes for which he was convicted.  In this respect, the Court notes that the evidence of Petitioner's guilt was overwhelming and Petitioner has not supplemented the record with any evidence calling into doubt his guilt.

Petitioner has failed to establish that good cause exists for his failure to properly raise these issues on his direct appeal as of right.  However, even if the Court assumes that Petitioner can demonstrate good cause, he has not established that he was prejudiced by his failure.  Petitioner has also failed to establish that a fundamental miscarriage of justice will result from the Court's failure to consider these claims.  The Court, therefore, is precluded from addressing the merits of these particular claims.  However, even if this determination is in error, Petitioner is not entitled to relief because Petitioner's procedurally defaulted claims are without merit as illustrated below.

A.     Double Jeopardy  (Habeas Claim I)

Petitioner asserts that his conviction for felonious assault violates the double jeopardy protections of the United States Constitution.  As discussed below, Petitioner's claim is based on a fundamental misunderstanding of certain comments made by the trial court.

After the presentation of evidence, but before closing arguments, the following exchange occurred (outside the presence of the jury):

> The Court:     We're going to continue on the record for a couple minutes.  You can all have a seat.  Let's see what we can cover on the record here with regard to the instructions before we go over them in more detail.
>
> The court's view of the evidence is that an instruction would be given on each of the four counts.  I don't see that there's any basis for giving any lesser included instructions but maybe I'm not seeing something that somebody else is.
>
> Mr. Jaconette, do you have any requests for lesser included instructions?
>
> Mr. Jaconette: No, there are none, Judge.
>
> The Court:     And, Mr. Sullivan?
>
> Mr. Sullivan:  I'd tentatively say no.  I'd like to consult with my client, though, before, I close the door on that.
>
> The Court:     Well, you certainly can and we can - this is all subject to adjustment before we finally get to the closing instructions but **obviously the charge is here of armed robbery and there's no evidence of anything other than an armed robbery that I'm aware of** so my view is that there'd be an instruction on armed robbery, felony firearm during the armed robbery, the assault with a dangerous weapon alleged to have occurred on Ms. - what's her name, Kane?
>
> Mr. Jaconette: Kane.
>
> The Court:     And, of course, the felony firearm in connection with that.

> I take it the parties are willing to waive the giving of claims and
> contentions by the Court hopefully, is that correct, Mr. Jaconette?

Mr. Jaconette: Yes, your Honor.

The Court:     And, Mr. Sullivan?

Mr. Sullivan:  Yes.

(Trial Transcript, Sept. 19, 2002, 429-30).

Petitioner's double jeopardy claim is based on the highlighted portion of the trial court's comments quoted above. While not artfully stated, Petitioner's claim appears to be that since "there's no evidence of anything other than an armed robbery" it violates his double jeopardy rights to have been convicted of felonious assault.

Petitioner has seriously misinterpreted the trial court's comments. As the lengthy exchange quoted above makes clear, the trial court's comment that "obviously the charge is here of armed robbery and there's no evidence of anything other than an armed robbery that I'm aware of" refers to whether it was appropriate to instruct the jury regarding a lesser included offense of armed robbery. Contrary to Petitioner's argument, the comments in question do not reflect a determination by the trial court that the evidence supported only a *charge* of armed robbery. The language on which Petitioner relies simply reflects the trial judge's assessment that with respect to the armed robbery charge it was not appropriate to also instruct the jury as to a lesser included offense of armed robbery because there was "no evidence of anything other than an armed robbery."

Petitioner's convictions for armed robbery, possession of a firearm during the commission of armed robbery, felonious assault, and possession of a firearm during the commission of a felonious assault do not violate the double jeopardy protections of the United States

53

Constitution.  Accordingly, this claim presents no issue on which habeas relief may be granted.

B.    Ineffective Assistance of Trial and Appellate Counsel  (Habeas Claim I)

Petitioner asserts that his attorney rendered ineffective assistance by failing to prevent the violation of his double jeopardy rights.  As discussed above, Petitioner's double jeopardy rights were not violated.  Accordingly, this claim is without merit.

C.    Actual Innocence  (Habeas Claim II)

Petitioner claims that he is entitled to relief because he is actually innocent of the crimes of which he was convicted.

In *Schlup v. Delo*, 513 U.S. 298 (1995), the Court held that "a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally-barred habeas petition."  *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005) (citing *Schlup*, 513 U.S. at 317).  Such a claim of actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  *Souter*, 395 F.3d at 588-89 (quoting *Schlup*, 513 U.S. at 315); *see also, Herrera v. Collins*, 506 U.S. 390, 400 (1993) (claims of actual innocence "have never been held to state a ground for federal habeas relief absent an independent constitutional violation" because "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - not to correct errors of fact").

To satisfy the *Schlup* actual innocence standard, a petitioner must demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a

reasonable doubt." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 327). Moreover, "actual innocence means factual innocence, not mere legal insufficiency." *Souter*, 395 F.3d at 588-89 (quoting *Schlup*, 513 U.S. at 327). Such a claim "requires petitioner to support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." *Souter*, 395 F.3d at 590 (quoting *Schlup*, 513 U.S. at 324).

Petitioner has failed to establish that he is innocent of the crimes for which he was convicted. Moreover, even if Petitioner could establish his innocence, such would not entitle him to habeas relief. Accordingly, this claim is without merit.


## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that McMillian's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  January 13, 2009                                /s/ Ellen S. Carmody
                                                       ELLEN S. CARMODY
                                                       United States Magistrate Judge